**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Jamarr Hairston,** | ) | **CASE NO. 1:04 CV 1037** |
| | ) | |
| **Petitioner,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Margaret Bradshaw, Warden,** | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| **Respondent.** | ) | |

This matter is before the Court upon the Report and Recommendation of Magistrate Judge Baughman, Jr. (Doc. 16) which recommends denial of the Petition for Writ of Habeas Corpus now pending before the Court.  For the following reasons, the Report and Recommendation is ACCEPTED.

<u>**Introduction**</u>

Petitioner, Jamarr Hairston, commenced this action with the filing of a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  Petitioner is incarcerated after a jury trial in the Cuyahoga County Court of Common Pleas.  This matter has been fully briefed and the Magistrate Judge issued his Report and Recommendation recommending that the Petition for

1

Writ of Habeas Corpus be denied.  Petitioner has filed Objections to the Report and

Recommendation.

### **Standard of Review**

Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts

provides, "The judge must determine *de novo* any proposed finding or recommendation to which

objection is made.  The judge may accept, reject, or modify any proposed finding or

recommendation."

### **Discussion**

A jury found petitioner guilty of aggravated murder with a firearm specification.  On

direct appeal, the court of appeals found the following facts:

> Sharon Small, the victim's mother, testified that she received a telephone call from her
> daughter Nicole about one week before she was murdered. Nicole, who was crying and
> very upset, asked her mother to pick her up. As a result of that phone call, Small took
> Nicole home to stay with her for several days.

> Small testified that she questioned Yvonne Moses, a close friend of Nicole's, regarding
> the man Nicole was seeing and why Nicole had called her in such an agitated state. Small
> testified that Yvonne told her Nicole was seeing a man named Jamaal and that she was
> very concerned for her daughter's safety after she learned what had happened to make
> Nicole so upset.

> Yvonne Moses testified that in December of 2000, she lived in apartment 406 at the
> Wade Park Chateau, a building well-known for drug activity. Moses testified further that
> Nicole visited her apartment frequently and would often stay with her for several days at
> a time. Moses also testified that she and Nicole would often get high together and Nicole
> would exchange sex for drugs.

> Moses testified that she met appellant, whom she knew as "Jamaal," approximately five
> years before Nicole's murder, when she began buying drugs from him. Moses testified
> further that she had seen appellant smoke cigarettes.

> According to Moses, in December of 2000, appellant began "coming around" the Wade
> Park Chateau almost every day. In the first week of December, Moses introduced
> appellant to Nicole and they had a sexual encounter in Moses' apartment. After appellant

left the apartment, Nicole came out of the bedroom and showed Moses the dope that appellant had given her. Upon searching appellant's jacket, which he had left in the apartment, Moses and Nicole found an "eight-ball" of crack cocaine, i.e., cocaine with a street value of $250. While they were smoking what Moses estimated to be about $50 worth of the cocaine, appellant telephoned and told Moses to tell Nicole to return his drugs. Appellant returned to Moses' apartment later that evening and demanded the return of his drugs. When Moses insisted that she and Nicole did not have them, appellant pulled out a gun, placed it on a table and stated, "I am not playing with you all." Moses testified that the gun was "like a .38 special" and that she had seen appellant carrying a gun in the past.

Moses then pretended to look for appellant's drugs. According to Moses, appellant was irritated because Nicole did not help look for the missing drugs. Moses discreetly moved the drugs to her couch and then pretended to find them there. Moses gave the drugs to appellant, who told her that "we was going to have to pay for what we had took, what was missing." Appellant then left the apartment, taking Nicole with him. When Nicole returned approximately ten minutes later, she was nervous and called her mother, crying, to come get her.

Moses testified that she saw appellant at the Wade Park Chateau several times after that incident. On either December 13 or 14, appellant came to Moses' apartment to use her telephone. As he was leaving the apartment, he turned to Nicole, who was visiting Moses, and asked when he was going to get his $50. According to Moses, appellant told Nicole, "you think I am playing with you, don't you?"

Moses testified that the last time she saw appellant at her apartment was during the hours of 9 p.m. and 3 a.m. on December 15 and 16, 2000, when appellant sold drugs to her and a friend.

According to Moses, Nicole was at her apartment the evening of December 18, 2000. Another friend, Harold Davis, came over at approximately 10:30 p.m. Moses testified that as she and Davis left her fourth-floor apartment at approximately 11:30 p.m. to go to the store, she saw appellant on the second floor of the apartment building. Nicole remained alone in Moses' apartment. When Moses, Davis and Arletta Legget, the friend who drove them to the store, returned to Moses' apartment later that evening, they found Nicole dead. Moses testified that upon seeing Nicole's body, she ran out of her apartment screaming "No, Jamaal, no."

Moses testified that although appellant never threatened to kill her, "what he said was enough." According to Moses, appellant told her that "he wasn't going to mess with us" in December because "it was a holy month" but "he was going to serve us on the 1st." Moses testified that she interpreted appellant's statement to mean that "he was going to come and do some type of bodily harm to me and Nicole. We was in some big trouble come January 1st."

3

Moses subsequently identified appellant as the man she knew as Jamaal through a police photo array.

Arletta Leggett testified that two weeks before Nicole was shot, appellant told her that he had had a dispute with someone who had taken his drugs. Leggett testified further that appellant was upset and told her "that he should kill those bitches or kill that bitch or some shit like that."

Diane Gore testified that she and her husband lived in apartment 206 at the Wade Park Chateau in December 2000. According to Gore, she saw appellant at the Wade Park Chateau approximately twice a week. Gore was aware that appellant carried a gun while he was at the Chateau because she had seen it on several occasions.

Gore testified that on the evening of December 18, 2000, she heard two gunshots as she was going down the stairs to leave the building. Gore continued down to the lobby of the building and then saw appellant coming out of another stairway into the lobby. Gore saw appellant put a gun in his pants as he walked down the hallway and then heard him tell another resident, "Don't forget what I said or the same thing is going to happen to you." Gore then saw appellant walk out the back door of the building and get into a gold Nissan Maxima driven by "Donny-man."

Deonte Burston testified that his nickname is "Donny-man." Burston testified that he often went to the Wade Park Chateau to sell drugs. Burston testified further that he had known appellant for five years and frequently saw him at the Wade Park Chateau.

According to Burston, on December 18, 2000, he arrived at the Wade Park Chateau at approximately 11:30 p.m. He parked his gold Nissan Maxima in the back of the building and entered the building through the back door. After only a few minutes, appellant appeared and asked him for a ride home.

Burston testified that appellant called him the next day and asked him to meet him at a restaurant. Later, at the restaurant, appellant told Burston that he had confronted Nicole the night before regarding the drugs she had taken from him and then shot her three times. Burston testified that he thought appellant was "playing," but appellant told him, "it's for real."

Dr. Erica Wilson, deputy coroner at the Cuyahoga County Coroner's Office, testified that she performed an autopsy on Nicole Small. Dr. Wilson testified that Nicole's death was ruled a homicide, the result of three gunshot wounds to her head. Dr. Wilson testified further that stipling and soot found around the wounds indicated that they were sustained at a range of three feet or less.

Curtiss Jones, a forensic scientist in the Trace Evidence Department of the Cuyahoga County Coroner's Office, testified that Nicole's right hand and left palm tested positive

4

for gunshot residue. Jones testified further that Nicole's hands did not react to a trace metal detection test, which meant that she had not held a metal object in her hands prior to her death.

Thomas Lucey, a City of Cleveland police detective who works in the Department's Scientific Investigation Unit, testified that he analyzed the three bullets recovered by the Coroner's Office from Nicole's body. Based on his tests, he concluded that at least one of the bullets came from a .38 or . 357 millimeter revolver.

Cleveland Police Detective Joseph Chojnowski testified that he arrived on the scene of the shooting at approximately 1:30 A.M. on December 19, 2000. Chojnowski collected evidence from the scene, including eight cigarette butts found in the ashtray in the living room of Moses' apartment.

Andrea Fischer testified that her primary responsibility as a forensic scientist in the Cuyahoga County Coroner's Office is DNA analysis. Fischer analyzed appellant's DNA and the DNA from the eight cigarette butts. According to Fischer, appellant's DNA was not found on seven of the cigarettes she tested but could not be excluded from one of the eight cigarettes recovered from the ashtray. Fischer testified that it was highly unlikely an individual unrelated to appellant would have his same DNA profile.

*State v. Hairston*, 2002 WL 31087374 (Ohio 8th App. Dist. Sept. 19, 2002).

Petitioner now asserts seven grounds in support of habeas relief.

The Magistrate Judge found the first and second claims to be unwarranted because the decision of the state appellate court on the merits was not an unreasonable application of clearly established federal law.  This Court agrees.

Ground One asserts a violation of the Fourteenth Amendment and states, "The Court of Appeals determined that there was error occurring during the course of petitioner's trial. However the Court of Appeals failed to apply the proper constitutional analysis to determine whether that error had a substantial and injurious effect on the jury's verdict."

In particular, the appellate court found comments made by the prosecutor, during argument, to be improper but concluded, "In the context of the entire trial, ...  these isolated statements [did not deny petitioner] a fair trial."  The court stated that in light of substantial,

5

credible evidence from which the jury could have found appellant guilty of aggravated murder, it was clear that even absent the prosecutor's improper comments, the jury would still have found appellant guilty.

Two comments were found to be improper.  The prosecutor commented in opening statement that various detectives investigating Nicole's murder left messages with petitioner's relatives and made appointments through those relatives for petitioner to meet with them, but petitioner did not keep the appointments. The prosecutor then commented that petitioner "kept his appointment at the Cleveland Muni Court Probation Department and that's where he was arrested."  The court found the comments to be improper because there was no evidence to show that petitioner had a prior criminal record, but the statement that petitioner was arrested at the probation department, improperly conveyed that information to the jury. Nor was there evidence produced at trial that there was a warrant for petitioner's arrest pending at any time when the detectives were arranging appointments to meet with him. As such, contrary to what the prosecutor's statement implied, petitioner had no duty to meet with the detectives.  The prosecutor also improperly commented in closing argument that petitioner could have performed his own testing on the cigarette butts taken from Moses' apartment.  The prosecutor stated, "Keep in mind they had the opportunity to test the stuff too, all that stuff is still available at the coroner's office to be tested."  The court found the comment to be "clearly improper" because a defendant is not required in any way to present any evidence on his own behalf.

Petitioner argues that these constitutional errors were analyzed wrongly by the appellate court and the statements had a substantial and injurious effect on the jury's verdict given that petitioner did not testify at trial.  This Court, however, agrees with the Magistrate Judge that the

6

appellate court applied the correct clearly established federal law applicable to improper

prosecutorial comments and reasonably applied it.  *See Hamblin v. Mitchell,* 354 F.3d 482 (6th

Cir. 2003) While the two comments were improper, the jury would still have found petitioner

guilty in light of the substantial, credible evidence presented at trial.

Ground Two also asserts a violation of the Fourteenth Amendment and states, "Petitioner

was denied due process of law and his right to present a defense when the prosecution failed to

disclose a witness and the trial court refused to take any corrective action to allow an

investigation of a newly disclosed witness."

Petitioner asserts that Diane Gore, a key state's witness, testified and that she was only

produced during the midst of trial although the prosecution knew where she lived one week after

the homicide.

The Magistrate Judge found that there was no clear and convincing evidence that the

appellate court was wrong in its factual finding that the prosecution did not willfully withhold

Gore's address.  Petitioner argues that the prosecution knew of the location of this witness and

refused to disclose it, thereby committing a willful violation.  This Court disagrees.

The appellate court noted that Gore testified that she contacted one of the detectives

investigating the case approximately one week after the murder and met with him at a restaurant.

When the detective asked her about her address and telephone number, Gore told him, "I didn't

want them to know where I lived." Gore never testified that she informed anyone of her actual

address, and testified that when served with a subpoena shortly before trial, she wondered how

the prosecutors got her address.  The record also reflected that prior to trial, the prosecutor saw

defense counsel in another courtroom and informed him, "David, by the way, we have an

7

additional witness, Diane Gore. We are going out to look for her, but I don't believe that we will have a real hope of finding her. We just found her now."

Petitioner fails to dispute these facts, but points to a portion of the trial transcript that, contrary to petitioner's assertion, does not establish that the state knew Gore's address one week after the homicide.  (Tr.  661-66)

Grounds One and Two have no merit.

Ground Three asserts a violation of the Sixth Amendment and states, "Petitioner was denied effective assistance of counsel where counsel committed a number of errors and omissions that adversely affected petitioner's right to a fair trial."

The Magistrate Judge recommended that the third ground for relief be denied as it did not involve the state court's unreasonable application of the clearly established law in *Strickland v. Washington,* 466 U.S. 668 (1984).  This Court agrees.

Petitioner maintains that he was denied effective assistance of counsel in numerous ways but fails to show how the state court unreasonably applied *Strickland.*  For example, petitioner asserts that his trial attorney, Jake Hildebrand, was unqualified to represent him due to the fact that this was an aggravated murder case and he was inexperienced.   As noted by the appellate court, petitioner argued that Hildebrand "did not meet the qualifications for the assigned counsel list maintained by the Cuyahoga County Common Pleas Court,... did not ask for an acquittal in his opening statement and did not cross-examine Arletta Leggett regarding her testimony that appellant had told her he should 'kill the bitch.'  " The appellate court found, however, that upon questioning by the trial judge, appellant specifically stated that he had no objection to Hildebrand's participation in the trial and, thus, he waived the issue. Moreover, John Hildebrand,

Sr. and David Grant were appellant's assigned counsel, not Jake Hildebrand. Therefore, there was no requirement that Jake Hildebrand meet the requirements for assigned counsel in an aggravated murder case. Also, the appellate court noted that in his opening statement, Hildebrand reviewed the evidence and then asked the jury to return a "true verdict," which the appellate court found akin to "not guilty." Finally, the court noted that trial tactics and strategies do not constitute a denial of effective assistance of counsel. Thus, Hildebrand's strategic decision not to remind the jury during his cross-examination of Arletta Leggett about her earlier testimony that appellant told her he should "kill the bitches or kill the bitch" is not ineffective assistance of counsel.

Petitioner asserts herein that the appellate court relied on silence concerning petitioner's objection to Hildebrand as counsel. This Court's review of the transcript, however, reveals that petitioner did expressly state that he did not object to Hildebrand as counsel. (Tr. 27-28) Nor does the Court disagree that the appellate court reasonably applied *Strickland.*

Ground Three is denied.

Ground Four asserts a violation of the Fourteenth Amendment and states, "Petitioner was denied due process of law when he was convicted of aggravated murder where there was insufficient evidence to [find] prior calculation and design. Moreover there was insufficient evidence to permit a rational fact finder to return a verdict of guilty."

Again, the Magistrate Judge concluded that the appellate court reasonably applied the applicable clearly established federal law. Petitioner does not dispute that the appellate court applied the correct law but asserts that there were no witnesses to the murder, leaving the state to rely on circumstantial evidence. As such, petitioner contends, there was no evidence to prove

9

prior calculation and design to support a conviction for aggravated murder.  This Court

disagrees.

The appellate court stated that, viewing the evidence in a light most favorable to the

prosecution, the evidence was sufficient to establish prior calculation and design:

> The evidence indicated that appellant threatened Nicole with a gun several times before
> she was murdered. Shortly after appellant learned that Nicole had stolen drugs from him,
> he demanded that she return the drugs, showing her his gun and stating, "I am not playing
> with you all." He then took Nicole out of the apartment for approximately ten minutes
> and apparently threatened her again, because when she returned, she was upset and
> crying and called her mother to come pick her up.
>
> The evidence also indicated that appellant made his intentions to kill Nicole well-known.
> Appellant told Arletta Legget about the dispute with Nicole over his drugs and told her
> that he "should kill the bitch." He also threatened Yvonne Moses that he was going to
> "serve" her and Nicole on January 1, a statement that Moses interpreted to mean that
> appellant was going to "do some type of bodily harm to me and Nicole."
>
> The evidence also indicated that Yvonne and Harold saw appellant on the second floor of
> the Wade Park Chateau as they were leaving the building on the night of Nicole's murder.
> The evidence further demonstrated that appellant, who usually carried a gun, did, in fact,
> have a gun that night. Finally, the evidence indicated that Nicole was shot not once but
> three times.
>
> The jury could have reasonably inferred from this evidence that appellant thought about
> shooting Nicole for some time prior to her death, took the gun with him to Wade Park
> Chateau with an intention to use it when an opportunity presented itself, and then seized
> the opportunity to kill Nicole when he knew Yvonne Moses and her friends had left the
> building. Therefore, the jury could have reasonably found the required element of "prior
> calculation and design."

Petitioner argues that because the decedent died of three gunshot wounds and there was blood

splattered on the wall and elsewhere, it would be reasonable to assume that the perpetrator would

have blood on him or her.  Additionally, the prosecution relied on a cigarette butt found in the

apartment but no evidence showed that the cigarette was attributable to petitioner or even that he

smoked.

10

Considering the evidence cited by the appellate court, a lack of blood would not likely have lessened the effect of the other evidence which sufficiently showed prior calculation and design.  Moreover, as pointed out elsewhere in the appellate court's opinion, when she was asked, "Does the defendant smoke cigarettes?", Yvonne Moses testified, "I have known him to smoke cigarettes but I have never seen him smoke cigarettes, just plain cigarettes." Thus, the court concluded that Moses testified that she had seen petitioner smoke cigarettes, although the type of cigarettes that petitioner smoked was not entirely clear from her statement.

Ground Four is denied.

Ground Five alleges a violation of the Sixth Amendment and states, "Petitioner was denied effective assistance of appellate counsel. There was a number of errors apparent upon the face of the record which were not presented in petitioner's original appeal."

The Magistrate Judge found this ground to be procedurally defaulted as petitioner did not present an ineffective assistance of appellate counsel claim on direct appeal to the Ohio Supreme Court although petitioner was represented by different legal counsel at trial than he had before the state appellate court, and the appellate counsel he had was different than his counsel on direct appeal to the Ohio Supreme Court.  This Court agrees that the claim is procedurally defaulted for failure to raise the issue at the first available opportunity.   Petitioner first raised this claim in his App.R. 26(B) Application for Reopening.  The appellate court found the claim to be barred by the doctrine of *res judicata*.  As recognized by the Magistrate Judge, petitioner's arguments to the contrary are not persuasive.

Ground Five is procedurally defaulted.

Ground Six alleges a violation of the Fourteenth Amendment and states, "Petitioner was

11

denied due process of law when the court diminished the requirement that the prosecution prove that petitioner had a specific intent to cause the death of another which was an element of aggravated murder."  Ground Seven also alleges a violation of the Fourteenth Amendment and states, "Petitioner was denied due process of law when the court instructed the jury concerning a presumption which eliminated the requirement that prosecution prove all elements of the offense of aggravated murder beyond a reasonable doubt."

The Magistrate Judge found both claims to be barred in that they were never presented in the state court on direct review although they could have been.  This Court agrees that these claims are barred in that they are procedurally defaulted.

For the foregoing reasons, petitioner has not demonstrated that the Petition for Writ of Habeas Corpus should be granted.

**Conclusion**

For the reasons set forth herein and for the reasons set forth in the Magistrate Judge's Report and Recommendation, the Petition for Writ of Habeas Corpus is denied.  Further, this Court hereby fully incorporates the Report and Recommendation by reference herein.

This Court now considers whether to grant a certificate of appealability (COA) pursuant to 28 U.S.C. § 2253 which states in relevant part:

*** 
(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –

> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

12

In *Slack v. McDaniel*, 529 U.S. 473 (2000), the United States Supreme Court determined that

> "[t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'"

*Id.* at 483-4 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) ).

If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id.* at 484.  In instances where a claim is  procedurally defaulted, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (emphasis supplied).

For the reasons stated above and in the Report and Recommendation, this Court finds no basis upon which to issue a certificate of appealablity.

IT IS SO ORDERED.

  /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 3/15/07